*BMG Monroe I, LLC v. Village of Monroe*

# United States Court of Appeals
# For the Second Circuit

August Term 2022

Argued:    February 6, 2023
Decided:   February 16, 2024

No. 22-1047

BMG MONROE I, LLC,

*Plaintiff-Appellant,*

*v.*

VILLAGE OF MONROE,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of New York
No. 20-cv-1357, Nelson S. Román, *Judge.*

Before:    PARKER, SULLIVAN, and LEE, *Circuit Judges.*

BMG Monroe I, LLC ("BMG"), the developer of a residential subdivision known as the "Smith Farm Project" in the Village of Monroe, New York (the "Village"), appeals from a judgment of the United States District Court for the Southern District of New York (Román, *J.*) dismissing BMG's claims against the Village under 42 U.S.C. § 1983 and the Fair Housing Act (the "FHA"), 42 U.S.C. § 12101 *et seq.*  In its complaint, BMG challenged the Village's denials of its applications for building permits on five lots that BMG sought to use for the

181-unit Smith Farm Project, alleging that the Village was motivated by discriminatory animus toward the Hasidic Jewish community, to which BMG intended to market the residential development, in violation of the Equal Protection Clause, U.S. Const. amend. XIV, § 1, cl. 4, and the FHA. The district court dismissed BMG's claims as unripe and, in the alternative, for lack of standing.

We agree with the district court that, in order to satisfy the finality requirement under our ripeness doctrine, a developer bringing a federal claim against a municipality for denying a building permit must first appeal an adverse planning-board decision to a zoning board of appeals *and* "submit[] at least one meaningful application for a variance," *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 348 (2d Cir. 2005). We also agree that BMG was not excused from these requirements on the grounds of futility simply because the Village indicated that it would likely not be receptive to a variance request that had yet to be made. Accordingly, we **AFFIRM** the judgment of the district court.

AFFIRMED.

> ROBERT S. ROSBOROUGH IV (Gabriella R. Levine, *on the brief*), Whiteman Osterman & Hanna LLP, Albany, NY, *for Plaintiff-Appellant*.
>
> LEO DORFMAN (Brian S. Sokoloff, *on the brief*), Sokoloff Stern LLP, Carle Place, NY, *for Defendant-Appellee*.

RICHARD J. SULLIVAN, *Circuit Judge*:

BMG Monroe I, LLC ("BMG"), the developer of a residential subdivision known as the "Smith Farm Project" in the Village of Monroe, New York

(the "Village"), appeals from a judgment of the United States District Court for the Southern District of New York (Román, *J.)* dismissing BMG's claims against the Village under 42 U.S.C. § 1983 and the Fair Housing Act (the "FHA"), 42 U.S.C. § 12101 *et seq.* In its complaint, BMG challenged the Village's denials of its applications for building permits on five lots that BMG sought to use for the 181-unit Smith Farm Project, alleging that the Village was motivated by discriminatory animus toward the Hasidic Jewish community, to which BMG intended to market the residential development, in violation of the Equal Protection Clause, U.S. Const. amend. XIV, § 1, cl. 4, and the FHA. The district court dismissed BMG's claims as unripe and, in the alternative, for lack of standing.

We agree with the district court that, in order to satisfy the finality requirement under our ripeness doctrine, a developer bringing a federal claim against a municipality for denying a building permit must first appeal an adverse planning-board decision to a zoning board of appeals *and* "submit[] at least one meaningful application for a variance," *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 348 (2d Cir. 2005). We also agree that BMG was not excused from

3

these requirements on the grounds of futility simply because the Village indicated that it would likely not be receptive to a variance request that had yet to be made. Accordingly, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A. Facts

In 2001, BMG proposed a residential development plan, which it dubbed the Smith Farm Project, to the Village and the Town of Monroe, New York (the "Town"). [1] Specifically, BMG sought permission to build a "large-scale residential cluster subdivision" featuring 181 homes and other recreational amenities. J. App'x at 34. According to its proposed plan, BMG would construct twelve single-family detached units, thirty-two duplex units, a community center, outdoor recreation areas, roads, and management facilities in the Village.

---

[1] As the district court noted, the developer that filed the 2001 application to the Village Planning Board was not BMG, but BMG's predecessor in interest. The record does not make clear, however, when or how that entity's interest in the Smith Farm Project was transferred to BMG. Accordingly, we refer to both entities interchangeably as "BMG." *See, e.g., Integrated Waste Servs., Inc. v. Akzo Nobel Salt, Inc.*, 113 F.3d 296, 297 n.1 (2d Cir. 1997) (noting that, since "successors in interest . . . stand in the shoes of their predecessors," they may appropriately be "referred to in [judicial] opinion[s] as if they were parties to the original [agreements and actions of their predecessors]").

4

Notably, BMG's proposed design features did not conform to the zoning codes of the Village and Town. For starters, parts of the Smith Farm Project would be located in the Village's "multi-family zoning district," which only "allow[ed] for . . . either row-house or multi[-]family residential [housing], by conditional use permit[s]." *Id.* at 150. Likewise, most of the other portions of the Smith Farm Project would be located in the Town's "multiple[-]dwelling" areas, in which developers would need "special exception use permit[s]" to build "semi-attached single family units," "townhouses," "row houses," and "duplex buildings." *Id.* at 151 (internal quotation marks omitted).[2] But "[i]nstead of designing the units in row houses or town houses, as would be required within the Village of Monroe[] and . . . within the Town of Monroe, [BMG] wished to create a more traditional layout of detached and semi-detached units [by] relying on specific traditional architectural designs." *Id.* at 153. In essence, BMG hoped to construct "[c]luster developments" as an "alternative permitted method for

---

[2] Roughly 10 out of the 79.2 acres of BMG's proposed development would be located in the Town's "Rural Residential" zone, which only permitted "single[-]family detached units." J. App'x at 151.

designing and configuring lots, buildings[,] and structures to preserve the natural qualities of open lands." *Id.* at 153 (internal quotation marks omitted).

The Village and Town reviewed BMG's application pursuant to mandatory procedures established by the New York State Environmental Quality Review Act ("SEQRA"), and ultimately allowed BMG to depart from their multi-family regulations so long as BMG satisfied certain conditions. On June 19, 2006, the Village and Town Planning Boards issued a joint Findings Statement (the "SEQRA Findings"), concluding that "all [statutory] requirements . . . ha[d] been met" and that the project "minimize[d] or avoid[ed] adverse environmental effects to the maximum extent practicable . . . by incorporating as conditions [specific] mitigation measures." J. App'x at 148. The SEQRA Findings expressly stated that approvals depended "on the incorporation of the housing styles, finishes, and the streetscape . . . attached to the[] [SEQRA] Findings," *id.* at 148 n.1, stressing that "the importance of that design integrity to the acceptability of the cluster [could not] be over-emphasized," *id.* at 153. They also included drawings depicting requirements for "architectural styling," *id.* at 164–65, and emphasized that construction had to abide by "a strict architectural code" and "critical

6

architectural criteria" concerning rear elevation, roof pitch, and siding materials, *id.* at 164–65.

On August 21, 2006, the Village Planning Board granted "preliminary conditional use approval" for the Smith Farm Project, J. App'x at 176 (emphasis omitted), while stressing again that its "approval[] . . . rel[ied] on and therefore [was] conditioned on [BMG's] incorporation of the housing styles, finishes, and the streetscape" presented in BMG's environmental-impact statements and attached to the SEQRA Findings, *id.* at 182. The Town Planning Board also granted preliminary conditional use approval of BMG's proposal on September 14, 2006.

In 2014, BMG prepared a revised site plan and applied for final project approvals from the Town and Village Planning Boards. And on August 10, 2015, the Town and Village Planning Boards issued an "Amended Lead Agency Findings Statement," *id.* at 197–209 (capitalization standardized), which "clarif[ied]" and "modif[ied]" certain conditions set forth in the SEQRA Findings, but otherwise left them "in full force and effect," *id.* at 198, 207. That same day, the Village and Town granted conditional final approvals for the Smith Farm

Project, while reiterating that the "conditions" of the final approval, J. App'x at 207, included BMG's "[f]ull compliance," *id.* at 126, with the "critical architectural criteria" from the Village's and Town's preliminary conditional approvals in 2006, *id.* at 165.

Between October 2017 and April 2018, BMG submitted applications to the Village's Building Inspector for permits to construct homes on the five Smith Farm Project lots at issue in this case: Lots 1, 2, 3, 45, and 46. Citing the failure of BMG's proposed construction plans to comply with the architectural criteria upon which the Village Planning Board had conditioned its approvals in 2006 and 2015, the Building Inspector denied each of the five applications.

BMG appealed the Building Inspector's denials of its applications for Lots 45 and 46 to the Village's Zoning Board of Appeals (the "ZBA"), but never appealed with respect to Lots 1, 2, and 3. The ZBA denied BMG's appeal on November 13, 2018, upholding the Building Inspector's determination that BMG's proposed construction plans for Lots 45 and 46 were "not in accordance with" the "strict architectural code" approved by the Village Planning Board. *Id.* at 358 (internal quotation marks omitted). Finally, on December 11, 2018, the ZBA

issued a written decision that denied BMG's application based on BMG's nonconformance with the rear-elevation, siding-materials, and roof-pitch conditions outlined in the SEQRA Findings.[3]

## B. Procedural History

In February 2020, BMG commenced this action in the district court, challenging the Building Inspector's denials of building permits for Lots 1, 2, and 3 and the ZBA's denial of its appeal as to Lots 45 and 46.[4] In April 2022, the district court dismissed the action without prejudice, finding that BMG's claims were unripe for judicial determination under *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), and that, in any event, BMG had failed to establish standing to bring "claims seeking to assert the rights of 'the Hasidic Jewish community.'" Sp. App'x at 15–22. This appeal followed.

---

[3] Between December 2018 and November 2019, the Building Inspector and Village approved BMG's applications for building permits for twenty-nine homes, including ones on Lots 45 and 46.

[4] Prior to bringing its federal action, BMG challenged the ZBA's decision in an Article 78 proceeding in state court. The state court declined to grant relief on the basis that the ZBA's decision was not "illegal, arbitrary or capricious, or an abuse of discretion." Dist. Ct. Doc. No. 30-12 at 5–6.

## II.   STANDARD OF REVIEW

We review *de novo* the district court's dismissal of a claim either as unripe, *see Sherman v. Town of Chester*, 752 F.3d 554, 560 (2d Cir. 2014), or for lack of standing, *see Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566–67 (2d Cir. 2016).   Although *Williamson County*'s prudential-ripeness doctrine "is not, strictly speaking, jurisdictional," *Horne v. Dep't of Agric.*, 569 U.S. 513, 526 (2013), we are free to affirm the district court's dismissal of a case on prudential-ripeness grounds without first addressing jurisdictional issues such as standing, *see Can v. United States*, 14 F.3d 160, 162 n.1 (2d Cir. 1994) ("[J]usticiability is . . . a 'threshold' question" that we may address "in advance of consideration of subject-matter jurisdiction."); *see also Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (characterizing prudential ripeness as "a justiciability doctrine"); *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (characterizing standing as jurisdictional).

## III.   DISCUSSION

"[I]n the land-use context," an equal-protection or FHA claim alleging discriminatory enforcement of zoning regulations "is not ripe until . . . the

'government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.'" *Vill. Green at Sayville, LLC v. Town of Islip*, 43 F.4th 287, 294 (2d Cir. 2022) (quoting *Williamson Cnty.*, 473 U.S. at 186). We have made clear that "appeal[ing] . . . to the Zoning Board of Appeals *and* request[ing] variance relief" are both necessary prerequisites to ripeness. *Murphy*, 402 F.3d at 352 (emphasis added). Under the law of this Circuit, ripeness is "condition[ed] . . . on a property owner submitting at least one meaningful application for a variance." *Id.* at 348; *see also id.* at 353 ("[F]ailure to pursue a variance prevents a federal challenge to a local land[-]use decision from becoming ripe."); *Williamson Cnty.*, 473 U.S. at 190 ("[I]n the face of [a developer's] refusal to follow the procedures for requesting a variance," the developer had "not yet obtained a final decision regarding how it [would] be allowed to develop its property.").

At the same time, *Murphy* provides that, under its futility exception, "[a] property owner [is] excused from obtaining a final decision if pursuing an appeal to a zoning board of appeals or seeking a variance would be futile." 402 F.3d at 349. A property owner is not required to pursue applications, for

11

example, "when a zoning agency lacks discretion to grant variances or has dug in its heels and made clear that all such applications will be denied." *Id.* Additionally, "a property owner [is] not . . . required to litigate a dispute before a zoning board of appeals if it sits purely as a remedial body." *Id.*

Here, the ripeness of BMG's action therefore turns on whether (1) the Village's denials of BMG's applications for building permits on each of the five lots at issue constitute "final decision[s]" under *Williamson County*, 473 U.S. at 186, and (2) BMG's failure to seek a second variance after it sought to depart from the terms of the SEQRA Findings, *i.e.*, the initial variance, is excused under our futility doctrine. We answer both questions in the negative.

As to Lots 1, 2, and 3, BMG's "failure" to pursue "[a]n appeal to the [ZBA]" would typically be "fatal" to its claims vis-à-vis those lots. *Murphy*, 402 F.3d at 352–53; *see also, e.g.*, *Sunrise Detox V, LLC v. City of White Plains*, 769 F.3d 118, 121–24 (2d Cir. 2014) (holding that "failure to . . . appeal [building] commissioner's" denial of building permit to "[z]oning [b]oard of [a]ppeals" rendered developer's claim "[un]ripe for judicial consideration"). Since New York law furnishes the ZBA with plenary authority to "reverse" or "modify" the Building Inspector's

decision and to "make such . . . determination as in *its* opinion ought to have been made," N.Y. Vill. Law § 7-712-b(1) (emphasis added), BMG's failure to obtain a decision from the ZBA "leaves undetermined the permitted use of the property in question," *Murphy*, 402 F.3d at 353; *see also Vill. Green*, 43 F.4th at 296 ("[I]t is 'virtually impossible' for us to determine 'what development will be permitted on a particular lot of land when its use is subject to the decision of a regulatory body invested with great discretion, which it has not yet even been asked to exercise.'" (quoting *Suitum v. Tahoe Reg'l Plan. Agency*, 520 U.S. 725, 739 (1997) (alterations omitted))).

BMG resists this conclusion by arguing that "an appeal to the ZBA from the denial of the permits for Lots 1, 2, and 3 would have been futile." BMG Br. at 25 (capitalization standardized). BMG contends that "[b]ecause Lots 1, 2, and 3 proposed the same construction and building design elements as Lots 45 and 46," the ZBA's "review of BMG's appeal for Lots 45 and 46" was "conclusive[]" as to "all lots." BMG Br. at 25–26. In essence, BMG argues that its otherwise-unripe claims relating to Lots 1, 2, and 3 can hitch a ride on the ripeness of its claims relating to Lots 45 and 46. As explained below, however, BMG's claims as to

13

Lots 45 and 46 turn out to be unripe because BMG never sought a variance for those lots based on the new building specifications it wished to implement, which did not conform to the requirements under the SEQRA Findings. Accordingly, BMG's claims as to Lots 1, 2, and 3 would not be ripe for the same reason, even if we accepted that BMG could invoke futility to excuse its failure to file an appeal to the ZBA on Lots 1, 2, and 3.

With regard to Lots 45 and 46, we first observe that BMG requested – and was granted – an initial variance from the zoning laws of the Village and Town so long as it abided by the conditions set forth in the SEQRA Findings. Specifically, BMG sought this conditional variance from the Village's multi-family zoning rules to create "[c]luster developments" – *i.e.*, "a more traditional layout of detached and semi-detached units" – "[i]nstead of designing the units in row houses or town houses, as *would be required within the Village of Monroe*." J. App'x at 153 (emphasis added). To allay the Village's concerns over environmental impact and village aesthetics, BMG indicated that although it would "rely[] on specific traditional architectural designs," it would also employ alternative methods to "configur[e]

14

lots, buildings[,] and structures to preserve the natural qualities of open lands."

*Id.*

At the time, however, "only the Town's zoning law permitted clustering," and so the Village had to consider whether it should allow for clustering under its zoning regulations. *Id.* The Village eventually decided to permit clustering – an action that was not normally allowed – provided that BMG comply with specified architectural requirements. In granting this variance, "the Village Board . . . adopt[ed] enabling legislation permitting the Village Planning Board to cluster" and the "Village and Town Planning Board attorneys . . . agreed to provide for . . . [a] preliminary special exception use permit . . . coupled with the cluster authorizations." *Id.* On these facts, we agree with the district court that the Village, through its Board and Planning Board, agreed to grant a conditional variance to BMG by permitting a departure from the zoning regulations that typically applied to the "true multi-family zoning district," so long as BMG implemented design features that would preserve the natural qualities of the land. *See* Sp. App'x at 3 ("For the Smith Farm Project, the developer proposed – and the Village agreed to allow – specific design features that *did not conform to the Village's*

15

*zoning code*." (emphasis added)); *Murphy*, 402 F.3d at 345 n.1 ("A variance is authority to an owner to use [its] property in a manner forbidden by the zoning regulations." (alterations and internal quotation marks omitted)); *Variance, Black's Law Dictionary* (11th ed. 2019) (defining "variance" as "official permission to do something other than what is normally allowed" and "official authorization to depart from a zoning law").

It naturally follows that, when BMG departed from the proposed layout and architectural designs attached to the SEQRA Findings, it was required to seek a second variance from the Village's zoning restrictions before proceeding to federal court. But BMG withdrew its application for a second variance after attending a single "workshop meeting" with the Village Planning Board – without providing it with an opportunity to vote or render its decision. J. App'x at 653 (capitalization standardized); *see id.* at 657 (Village Planning Board minutes reflecting BMG's statement that it was "going to withdraw the application and rely on the judicial determination of the courts"). Without question, a prematurely withdrawn application for a variance is not a "meaningful application for a variance." *Murphy*, 402 F.3d at 348.

16

We conclude that after the ZBA affirmed the Village Planning Board's finding that BMG's construction plans did not *comply* with previously agreed-upon conditions, BMG was then required to "submit[] at least one meaningful application for a *variance*" to the Village Planning Board or ZBA to see whether it could apply clustering techniques in the multi-family district while using the new rear elevation, roof pitch, and siding materials.[5]  *See id.*  Put simply, the SEQRA Findings provided the terms BMG had to abide by in order to depart from the normally applicable land-use restrictions in the Town and Village.  As a result, if BMG wished to alter those conditions, it first had to seek another variance before proceeding to federal court.  *Cf. Southview Assocs., Ltd. v. Bongartz*, 980 F.2d 84, 98–99 (2d Cir. 1992) (holding that, even where "the Board ha[d] denied[] . . . one application," developer still faced burden of establishing that "submission of *another* application would be futile" (emphasis added)).

Once again, BMG invokes futility, arguing that the Village Planning Board "made clear" that it would "refuse[] to consider any amendment to [its conditions

---

[5] It bears noting that BMG only asked the ZBA to decide whether its proposed construction plans for Lots 45 and 46 *complied* with the conditions of the Village Planning Board's approval of the Smith Farm Project.   It never asked the ZBA to grant a *variance* from those conditions.

on] the Smith Farm Project's approvals." BMG Br. at 28, 32–33 (citation omitted).

But BMG's assertions that the Village Planning Board "refused to entertain the application [for a variance]" or "to consider any amendment to [the conditions it had originally imposed on] the Smith Farm Project's approvals," *id.* at 32–33, are belied by the record. Indeed, the minutes of the Village Planning Board workshop demonstrate that its members *were* actively considering BMG's request for a variance, albeit with some initial skepticism. For example, one member stated that he "d[id] not feel the [Planning] [B]oard should depart from the [conditions of the] original approvals," while others stated that they "did not want to change what was approved." J. App'x at 656–57. We do not read these statements as the Village Planning Board "d[igging] in its heels and ma[king] clear that all [variance] applications w[ould] be denied." *Murphy*, 402 F.3d at 349. While the Village Planning Board might have expressed *doubts* about BMG's prospects for receiving a variance, "mere doubt that [a variance] application would be [granted] is insufficient to establish futility." *Dreher v. Doherty*, 531 F. App'x 82, 83 (2d Cir. 2013) (citing *Manufactured Home Cmtys., Inc. v. City of San Jose*,

18

420 F.3d 1022, 1035 (9th Cir. 2005); *Gilbert v. City of Cambridge*, 932 F.2d 51, 61 (1st Cir. 1991)).[6]

Finally, BMG points to the Supreme Court's recent decision in *Pakdel v. City & County of San Francisco*, 141 S. Ct. 2226 (2021), to argue that the law with respect to futility has changed. We disagree. Although the Supreme Court in *Pakdel* held that "[o]nce the government is committed to a position, . . . the dispute is ripe for judicial resolution," the property owners in that case had made at least one request for a variance, and "the relevant zoning agency could no longer grant relief" since the applicable statute of limitations had expired. *Id.* at 2229–31 (alterations and internal quotation marks omitted). Under those circumstances, the Court found "no question about how the regulations at issue appl[ied] to the particular land in question." *Id.* at 2230 (alterations and internal quotation marks omitted).

---

[6] Alternatively, BMG contends that the ZBA had no power to grant variances from subdivision-plan conditions imposed by the Village Planning Board. BMG Br. at 28 ("[T]he ZBA lacks any jurisdiction" to "vary the conditions of [the] Planning Board's site plan approval.") In response, the Village appears to suggest that this argument was abandoned by BMG. We need not resolve this issue, however, because even if futility excused BMG's failure to seek a variance from *the ZBA*, it would not excuse BMG's failure to seek a second variance from *the Village Planning Board*.

Here, in sharp contrast, the Village has *never* denied a single request for a variance from the Village's and Town's multi-family zoning regulations based on the updated building specifications that BMG sought to use. Likewise, it is undisputed that the Village Planning Board retains jurisdiction – to this day – to grant such a variance. Thus, it cannot be said that the Village "is committed to a position" that resembles that of the defendant in *Pakdel*. *Id.* To the contrary, because "avenues still remain for the [Village] to clarify or change its decision," this is a case where BMG's "failure to properly pursue administrative procedures" *does* "render [its] claim unripe." *Id.* at 2231.

## IV. CONCLUSION

In its original proposal for the Smith Farm Project, BMG requested a variance from the zoning codes of the Village and Town to allow it to create "cluster developments" in a multi-family zoning area. The Village and Town granted this conditional variance, but later ruled that BMG had not complied with the terms set forth in the SEQRA Findings. At that point, since BMG wished to alter the conditions of its initial variance, it needed to do more than appeal the Village Planning Board's finding that it was not in *compliance* with the terms

presented in the SEQRA Findings; it needed to apply for a second *variance* from the zoning regulations based on the updated rear elevation, roof pitch, and siding materials in order to secure a Village Planning Board decision that was final. BMG cannot sidestep that requirement merely by asserting that the Village Planning Board did not appear to be receptive to granting another variance. Faithful application of the "meaningful variance" requirement not only comports with our settled law, *see Murphy*, 402 F.3d at 348, but also furthers sound policy in light of the oft-stated concern that federal courts might be transformed into "the Grand Mufti of local zoning boards," *id.* at 348–49 (internal quotation marks omitted) (collecting cases).

For all these reasons, we **AFFIRM** the judgment of the district court.

21