# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 14, 2024        Decided January 14, 2025

No. 23-1334

INDUSTRIAL ENERGY CONSUMERS OF AMERICA, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

ITC MIDWEST LLC,
INTERVENOR

———

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

———

*Kenneth R. Stark* argued the cause for petitioners. With him on the briefs were *Robert A. Weishaar, Jr.*, *James Harrison Holt*, and *Katherine Ann Wade*.

*Jason T. Perkins*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Matthew R. Christiansen*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Aaron M. Streett* argued the cause for intervenor ITC Midwest LLC in support of respondent. With him on the brief were *Jay Ryan*, *J. Mark Little*, and *Christopher E. Tutunjian*.

Before: HENDERSON and PAN, *Circuit Judges*, and ROGERS, *Senior Circuit Judge*.

Opinion for the Court by *Senior Circuit Judge* ROGERS.

Concurring opinion by *Circuit Judge* HENDERSON.

ROGERS, *Senior Circuit Judge*: Petitioners seek review of the grant of an abandonment incentive to ITC Midwest, LLC ("ITC"). The Federal Energy Regulatory Commission approved the first of two stages of the rate incentive in the event a planned transmission project is abandoned for reasons beyond ITC's control. Because petitioners fail to show imminent injury as a result of this action, they lack Article III standing and the court must dismiss the petition for lack of jurisdiction.

## I.

To induce new investment in energy infrastructure, Congress enacted the Energy Policy Act of 2005, which amended the Federal Power Act ("FPA") and required the Commission to adopt rules for "incentive-based . . . rate treatments for the transmission of electric energy." 16 U.S.C. § 824s(a). In 2006 the Commission adopted Order No. 679, which establishes eight categories of incentives for public utilities. *Promoting Transmission Inv. Through Pricing Reform*, Order No. 679, 116 FERC ¶ 61,057 at PP 76–77, 163–67 (2006) ("Order 679"), *on reh'g*, Order No. 679-A, 117 FERC ¶ 61,345 (2006) ("Order 679-A"). To qualify for an incentive, the utility first must show (1) "the facilities for which

it seeks incentives either ensure reliability or reduce the cost of delivered power by reducing transmission congestion," (2) there is a nexus between the total package of incentives and the utility's ability to address the risks or challenges it faces, and (3) "the resulting rates are just and reasonable." Order 679 at P 76; Order 679-A at P 27.

One incentive is the abandonment incentive that allows a utility to recover 100% of its prudently incurred costs in transmission rates for projects abandoned due to factors beyond the utility's control. Order 679 at PP 155, 163, 166; *San Diego Gas & Elec. Co. v. FERC*, 913 F.3d 127, 132 (D.C. Cir. 2019). A utility must first obtain a declaratory order from the Commission establishing its eligibility for the incentive and then obtain the Commission's approval for a specific rate increase to recover those costs "prudently incurred . . . after the effective date of the order." *San Diego Gas & Elec.*, 913 F.3d at 133, 137–39. Only then may a utility increase its rates. "[T]o ensure that rate cases are manageable, the Commission presumes that all expenditures are prudent so the utility need not justify in its case-in-chief the prudence of all of its costs." *Potomac-Appalachian Transmission Highline, LLC*, 158 FERC ¶ 61,050 at P 100 (2017). Of course, the incentives must be "tailored to address the demonstrable risks or challenges faced by the applicant." 18 C.F.R. § 35.35(d). The Commission proceeds by case-by-case adjudication. Order 679 at PP 43, 164; *Promoting Transmission Inv. Through Pricing Reform*, Policy Statement, 141 FERC ¶ 61,129 at PP 6–10 (2012) ("Policy Statement").

ITC submitted a request for an abandonment incentive on May 30, 2023, for the Iowa portion of the Skunk River-Ipava 345 kV Long-Range Transmission Plan Project. Request 1; *see* 16 U.S.C. § 824d; Order 679; Policy Statement. This is one portion of a transmission project crossing several states that

was approved by Midcontinent Independent System Operator, Inc. ("MISO"). Pursuant to its open access tariff and the Iowa Right of First Refusal statute ("Iowa ROFR"), MISO assigned the Iowa portion of the project ("Project") to ITC. ITC is to own and construct the Project, which is to become operational in 2029.

In requesting an abandonment incentive, ITC stated that the Project would satisfy each of Order 679's requirements. The Project would "enhance reliability" and "reduce congestion" because it is one of several transmission projects that together would "address 600 thermal violations associated with 77 unique monitored facilities." Request 4–5. It also would "[i]ncrease transfer capability" and "[e]nhance the resilience of the grid" while "[r]educ[ing] loading." *Id*. at 5. Further, the Project "satisfies the Commission's nexus test because the challenges faced . . . are significant and the Abandonment Incentive sought is appropriately tailored to address" regulatory and environmental, financial, and construction risks. *Id.* at 6; *see* Test. of Jeffrey W. Eddy, Dir. of Plan., ITC Holdings Corp. 8–11 (May 30, 2023). And ITC stated that its rates "will be just and reasonable" because it cannot collect abandonment costs until it makes a filing "demonstrating the prudence of the costs for which recovery is sought." Request 8.

Petitioners are the Resale Power Group of Iowa, the Industrial Energy Consumers of America, the Coalition of MISO Transmission Customers, and the Wisconsin Industrial Energy Group. They are a collection of organizations whose members purchase electricity at rates that could be affected by the disputed incentive. They filed a protest opposing the abandonment incentive on the ground that ITC's ownership of the Project was "uncertain" and likely "void" due to ongoing litigation challenging the Iowa ROFR. Protest 11.

On August 8, 2023, the Commission granted ITC's request for the abandonment incentive. Order on Transmission Rate Incentive, *ITC Midwest, LLC*, 184 FERC ¶ 61,083 at P 43 (2023) ("*Incentive Order*"). Finding that the Project is entitled to the rebuttable presumption that it will "enhance reliability and/or reduce congestion," *id.* at P 16, the Commission concluded that ITC had "demonstrated that the Project faces certain regulatory, environmental, and siting risks that are beyond ITC['s] control . . . and that approval of the . . . Incentive will address those risks," *id.* at P 43. The Commission rejected petitioners' protest that ongoing state court litigation called into question ITC's ability to proceed with the Project "free and clear of any legal impediments." Protest 12. The litigation challenged the Iowa ROFR under which MISO assigned the Project to ITC. The Commission, citing its precedent, stated that "[t]he presence of regulatory or litigation uncertainty does not preclude . . . granting" an abandonment incentive in an adjudication. *Incentive Order* at P 44 & n.77 (citing Order 679 at PP 163–65; *NextEra Energy Transmission Sw., LLC*, 180 FERC ¶ 61,032 at PP 8, 18–19 (2022); *Pioneer Transmission, LLC*, 126 FERC ¶ 61,281 at P 49 (2009), *order on reh'g & clarification*, 130 FERC ¶ 61,044 at P 58 (2010)). The Commission also stated that it "will address the prudence of any costs incurred if and when ITC . . . makes a filing under section 205 seeking recovery of such costs, and . . . any . . . interested person . . . is free to challenge the prudence of such costs at that time." *Id.* at P 45. One Commissioner dissented on the ground that the Iowa ROFR might be "struck down," rendering assignment of the Project to ITC uncertain and ITC's incentive request premature. *Incentive Order* at P 1 (Christie, Comm'r, dissenting).

Petitioners sought rehearing, principally on the ground that the Commission did not "engage the implications of granting" ITC's request during the pendency of litigation challenging the Iowa ROFR. Reh'g Req. 9–20. Rehearing was denied. *ITC Midwest, LLC*, 185 FERC ¶ 62,013 (2023); 16 U.S.C. § 825*l*(a). On November 16, 2023, the Commission addressed the arguments raised on rehearing and again stated that granting the abandonment incentive despite the uncertainty surrounding the Iowa ROFR is consistent with Commission precedent. *ITC Midwest, LLC*, 185 FERC ¶ 61,123 at P 37 (2023) ("*Rehearing Order*") (citing *MISO*, 184 FERC ¶ 61,040 at PP 16, 20 (2023); *NextEra*, 180 FERC ¶ 61,032 at P 8).

Petitioners seek review of the *Incentive Order*, the denial of rehearing, and the *Rehearing Order*.

**II.**

As a threshold matter, the court must determine whether it has jurisdiction to consider petitioners' challenges to the Commission's stage one approval of ITC's request for an abandonment incentive.

"To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)). "Allegations of possible future injury do not satisfy the requirements of Art. III." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990). And "a mere interest in [the Commission's] legal reasoning and the possibility of a 'collateral estoppel effect'" in a future proceeding do not "confer a cognizable injury in fact." *Exxon Mobil Corp. v. FERC*, 571 F.3d 1208, 1219 (D.C. Cir. 2009)

(quoting *Ala. Mun. Distribs. Grp. v. FERC*, 312 F.3d 470, 473–74 (D.C. Cir. 2002)).

The Commission has addressed the first of its two-stage procedure for an abandonment incentive in the *Incentive Order*. On rehearing, the Commission repeated that its approval "is not a determination as to the prudence of any costs that ITC . . . actually incurs," and that it "will assess the prudence of . . . expenditures, including any challenges thereto, if and when ITC . . . makes a filing under section 205 seeking recovery of such costs." *Rehearing Order* at P 36; *see Incentive Order* at P 45. No petitioner has demonstrated imminent injury from the challenged orders. *See Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996) (citations omitted).

First, petitioners maintain that their standing is "self-evident," Pet'r Br. 21, by reason of being "aggrieved" persons under the FPA, 16 U.S.C. § 825*l*(b), as a result of the Commission's determination that ITC is eligible for an abandonment incentive for the Project. Reply Br. 10. The court explained in *Kansas Corporation Commission v. FERC*, 881 F.3d 924, 929 (D.C. Cir. 2018), that a party "must affirmatively demonstrate how it is adversely affected by [the Commission]'s orders." Petitioners claim injury from higher rates that ITC may one day charge consumers if it abandons the Project. Absent any incentive, ITC could recover through higher rates 50% of its prudently incurred costs if it abandoned the Project. *See New Eng. Power Co.*, Op. No. 295, 42 FERC ¶ 61,016 (1988), *on reh'g*, Op. No. 295-A, 43 FERC ¶ 61,285 (1988). With an abandonment incentive, ITC may recover 100% of its prudently incurred costs, exposing petitioners to the risk of higher future rates. Petitioners point to no imminent or concrete costs any one of them now confronts as a result of the *Incentive Order*, and at stage two petitioners will have an

opportunity to challenge the prudence of costs ITC seeks to recover. Petitioners misread the court's decision in *San Diego Gas & Electric* to support standing even in the face of uncertainty about the abandonment of a project or associated costs. Reply Br. 11–12. In *San Diego Gas & Electric*, however, a utility disputed "the scope of the" incentive it received, which had an immediate effect on its present costs. 913 F.3d at 130, 136. Here, petitioners challenge the grant of an incentive to a third party that has no immediate impact on them as consumers. Petitioners' other authorities do not advance their position. Both *MISO Transmission Owners v. FERC*, 45 F.4th 248, 252–56 (D.C. Cir. 2022), and *Delaware Division of the Public Advocate v. FERC*, 3 F.4th 461, 463 (D.C. Cir. 2021), involved concrete, imminent harms because of, respectively, overcharges on rates and revisions to a capacity market auction mechanism used at yearly auctions.

Second, petitioners maintain that they are aggrieved under the FPA because the Commission "insufficiently examined" the facts set forth in ITC's request for an abandonment incentive. Reply Br. 11–12. Specifically, they maintain that that the Commission did not "practically account for the impact of the Iowa ROFR Law litigation," and failed to "specify any risks in any degree of detail that are uniquely faced by the Project." Pet'r Br. 31, 44–45. A party only claiming an interest in proper application of the law lacks standing absent a showing that it is "more directly and tangibly benefit[ed] . . . than . . . the public." *Kan. Corp.*, 881 F.3d at 929–30 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573–74 (1992)). Petitioners make no such showing as a result of the challenged orders.

Third, petitioners maintain that the Commission's approval of ITC's request determines "the terms under which a claim *may or may not be filed*" in the future. Reply Br. 10. So,

they "are now precluded in any future" Section 205 proceeding from arguing that the factual evidence on which ITC based its application did not warrant granting an incentive. *Id.* at 12. Further, they claim, "the Commission's determination of the applicant's eligibility and corresponding decision to increase prudently-incurred abandoned plant costs eligible for recovery to 100% is also final and will not be the subject of, and cannot be cured in, any future rate proceeding." *Id.* at 4; *see* Order 679 at P 78. An interest in the collateral estoppel effect of the *Incentive Order* on future rates that petitioners may pay does not suffice to establish Article III standing. *See Exxon Mobil*, 571 F.3d at 1219; *Kan. Corp.*, 881 F.3d at 931.

To the extent petitioners maintain that the challenged orders "prejudged the prudency of ITC['s] incurrence of Project costs," and "foreclosed the ability to argue that '*none* of those costs were prudently incurred,'" Pet'r Br. 39 (quoting Reh'g Req. 13–14), they ignore the record. The Commission repeatedly stated that it was not prejudging the prudence of costs incurred by ITC. *Incentive Order* at P 45; *Rehearing Order* at P 36. Petitioners view the prudence standard to be "highly deferential toward transmission owners." Pet'r Br. 39. At stage two petitioners need only "create[] serious doubt as to the prudence of an expenditure" for which ITC seeks 100% recovery in its rates. *Incentive Order* at P 45 n.79 (quoting *Potomac-Appalachian Transmission Highline*, 158 FERC ¶ 61,050 at P 100). The burden then shifts to ITC to "dispel[] these doubts and prov[e] the questioned expenditure to have been prudent." *Potomac-Appalachian Transmission Highline*, 158 FERC ¶ 61,050 at P 101 (quoting *Anaheim, Riverside, Banning, Colton, & Azusa, Cal. v. FERC*, 669 F.2d 799, 809 (D.C. Cir. 1981)). Indeed, in seeking rehearing petitioners acknowledged that the Commission "could reasonably find" that any development and construction expenses after the August 8, 2023 *Incentive Order*, were imprudent because

incurred after the Iowa Supreme Court had enjoined enforcement of the Iowa ROFR. Reh'g Req. 12.

Finally, petitioners fail to demonstrate that they will ever suffer any injury from ITC's award of an abandonment incentive if the Project is constructed as ITC maintains through counsel that it intends to do. Oral Arg. 55:09–55:24. Instead, ITC suggests, petitioners offer a speculative, attenuated chain of events. *See* ITC Intervnr. Br. 16–18. For their injury to occur, not only would the Iowa Supreme Court need to affirm a permanent and retroactive Iowa ROFR injunction, MISO would need to open competitive bidding for the Project, and ITC would need to lose the bid, invoke the abandonment incentive, and demonstrate to the Commission its costs were prudent and the resulting rates are just and reasonable and not unduly discriminatory, 16 U.S.C. §824s(d). A "highly attenuated chain of possibilities" predicated on "guesswork as to how independent decisionmakers will exercise their judgment" does not establish Article III standing. *Clapper*, 568 U.S. 410, 413.

Accordingly, because no petitioner has shown an imminent injury in fact as a result of the challenged orders, petitioners lack Article III standing and the court dismisses the petition for lack of jurisdiction.

KAREN LeCRAFT HENDERSON, *Circuit Judge*, concurring: I agree with the Court's opinion in full. I write separately to question the continuing vitality of two doctrines teed up by this case: ripeness and associational standing.

**I.**

In this appeal, the Commission adopted the confusing position that Petitioners have standing but that their claims are nevertheless unripe. In FERC's view, its initial determination to award ITC Midwest an abandonment incentive has existing legal consequences sufficient to support Petitioners' Article III standing. But because Petitioners' concerns relate solely to the step two recovery decision—a decision that may occur only in a future proceeding based on facts not yet gathered—the Commission argues that we should "defer[]" resolution of this case "[a]s a prudential matter" of ripeness. Red Br. 29.

I believe ripeness is a solution in search of a problem and a needlessly muddied area of justiciability. The Supreme Court has explained that ripeness is "drawn both from Article III . . . and from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (quoting *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993)). Insofar as ripeness traces its lineage to Article III, it has become absorbed by standing. Insofar as ripeness rests on prudential considerations, it infringes on our constitutional duty to adjudicate a proper case or controversy.

The ripeness inquiry centers on whether a case is ready for adjudication and is designed to oust claims that are "contingent [on] future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1988). Courts apply a two-part ripeness test that evaluates (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties" of withholding review. *Abbott Labs. v.*

*Gardner*, 387 U.S. 136, 149 (1967); s*ee N. Ind. Pub. Serv. Co. v. FERC*, 954 F.2d 736, 738 (D.C. Cir. 1992) (applying *Abbott Labs* to review of FERC decision making). Ripeness helps ensure that courts do not expend their limited resources resolving "premature[]" and "abstract disagreements." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996). The paradigmatic unripe case is one that challenges a preliminary agency policy that has not been—and may never be—enforced against the named plaintiff. *See, e.g.*, *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 386 (1999).

Article III standing, by contrast, asks whether a case pairs a proper plaintiff with a proper defendant. To establish standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Injury in fact ensures that the plaintiff has a sufficient "personal stake" in the outcome of the litigation. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quotations omitted). The paradigmatic uninjured plaintiff is one whose only claim is an abstract interest in seeing that other parties follow the law. *See, e.g.*, *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 23–24 (1998).

First, ripeness and standing focus on two different issues: ripeness asks whether the suit is brought at a proper time and standing asks whether the named plaintiff is a proper party to sue. The latter goes to the "who"; the former goes to the "when." But if the plaintiff's claim depends on a threatened future injury, the two ask a combined question: is the plaintiff's

asserted injury too speculative? If so, the plaintiff lacks standing because his feared injury is not "imminent," *Lujan*, 504 U.S. at 564, nor "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). That time-based inquiry describes ripeness. *See Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 140 (1974) ("[R]ipeness is peculiarly a question of timing").

The two inquiries focus judicial attention on the same operative facts. Ripeness looks to whether a claim has sufficiently "matured" to avoid resolution of cases "contingent [on] future events." 13B CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FED. PRAC. & PROC. JURIS. § 3532 (3d. ed.). Standing similarly looks to whether an "attenuated chain of possibilities" renders a plaintiff's injury too "contingen[t]." *Clapper*, 568 U.S. at 410. The purposes served by ripeness and standing also align. Ripeness aims to "prevent the courts" from engaging in "premature adjudication" of "administrative policies, and also protects the agencies from judicial interferences until" necessary. *Abbott Labs.*, 387 U.S. at 148–49. So too with standing. *See Clapper*, 568 U.S. at 408 ("Article III standing[] is built on separation-of-powers principles[ and] serves to prevent the judicial process from being used to usurp the powers of the political branches.").

Indeed, once a plaintiff satisfies standing, any ripeness concern becomes superfluous. We have long acknowledged that the "ripe[ness inquiry] . . . overlaps with the 'injury in fact' facet of standing doctrine." *Navegar, Inc. v. United States*, 103 F.3d 994, 998, (D.C. Cir. 1997); *accord Nat'l Treasury Emps. Union*, 101 F.3d at 1427 ("Ripeness, while often spoken of as a justiciability doctrine distinct from standing, in fact shares the constitutional requirement of standing that an injury in fact be certainly impending."). More recently, this Court has

explained that "[c]onstitutional ripeness is subsumed into the Article III requirement of standing." *POET Biorefining, LLC v. Env't Prot. Agency*, 970 F.3d 392, 403 (D.C. Cir. 2020) (internal quotations omitted). And, as the Supreme Court has noted, "[t]he justiciability problem that arises" in many cases "can be described in terms of standing . . . or in terms of ripeness." *MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 128 n.8 (2007). Notably, the Supreme Court has not disposed of a case purely on ripeness in years. Recently, it described standing and ripeness as "[t]wo related doctrines of justiciability—each originating in the case-or-controversy requirement of Article III." *Trump v. New York*, 592 U.S. 125, 131 (2020). The Court then went on to resolve *Trump* without distinguishing between the two.

But ripeness purports to go further. In addition to its constitutional underpinning, ripeness also has a "prudential" component. *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808. That is, even if a plaintiff meets all Article III requirements, the court may still decline to exercise its jurisdiction. Indeed, prudential ripeness may even be raised *sua sponte*. *See id.* ("[I]n a case raising only prudential concerns, the question of ripeness may be considered on a court's own motion."). Yet as Chief Justice John Marshall declared more than two centuries ago, federal courts "have no more right to decline the exercise of a jurisdiction which is given than to usurp that which is not given." *Cohens v. Virginia*, 19 U.S. (6 Wheat) 264, 404 (1821). Absent narrowly confined exceptions, courts possess a "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). And those finite exceptions have been deemed "exceptional circumstances." *Id.* at 813. "Judicial resources" and "judicial restraint" concerns— used to apply prudential ripeness, *Devia v. Nuclear Regul. Comm'n*, 492 F.3d 421, 424 (D.C. Cir. 2007)—do not square with the

"strict [judicial] duty to exercise the jurisdiction that is conferred upon [the judiciary] by Congress." *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 716 (1996).

So how has the ripeness doctrine come to be viewed otherwise? Ripeness began as an articulation of the remedial discretion of a court sitting in equity but has evolved into a limitation on the court's power to adjudicate a proper case or controversy. Richard H. Fallon, Jr., *The Linkage Between Justiciability and Remedies—And Their Connections to Substantive Rights*, 92 Va. L. Rev. 633, 635–37, 678–681 (2006). The Supreme Court first applied ripeness as a prudential matter in *Abbott Laboratories*. 387 U.S. at 149. There, several drug manufacturers sought pre-enforcement review of FDA regulations requiring that any label or advertisement listing a drug's trade name also include the generic name. *Id.* at 138–39. The Supreme Court set forth the familiar two-factor test for ripeness, found those factors satisfied and remanded to the lower courts to reach the merits. *Id.* at 149, 156. Notably, the Court rooted its ripeness holding in the inherently "discretionary" nature of "injunctive and declaratory judgment remedies," which helps explain why the two-factor test uses traditional equitable factors such as hardship to the parties. *Id.* at 148. Confined to a remedial principle, prudential ripeness makes sense: an injunction is an "extraordinary remedy," *Nken v. Holder*, 556 U.S. 418, 428 (2009) (citation omitted), issued as "a matter of equitable discretion." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008). Courts have thus evinced "a greater concern about ripeness" when "asked to give equitable remedies." Samuel L. Bray, *The System of Equitable Remedies*, 63 UCLA L. Rev. 530, 549 n.85 (2016).

In the last several decades, however, courts have been less than meticulous in delineating between jurisdictional (i.e.

constitutional) requirements and non-jurisdictional (i.e. prudential) considerations. *See, e.g.*, *Allen v. Wright*, 468 U.S. 737, 750–51 (1984) (speaking of "prudential" requirements that "relate" and "overlap[]" with constitutional standing); *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471–72 (1982) (acknowledging that the Court has not always drawn crisp lines between constitutional and prudential considerations). Ripeness has become part of the jurisdictional analysis and, as the scope of injury in fact has expanded, has become largely subsumed in constitutional standing. At the same time, courts continue to speak of a separate prudential component to ripeness. The result has been a prudential ripeness requirement covered with a jurisdictional veneer. *See Reno*, 509 U.S. at 57 n.18 (holding that "prudential" ripeness can serve as a basis "for refusing to exercise jurisdiction").

In more recent years, the Supreme Court has begun to put these doctrines back where they belong. In 2014, the Court explained that so-called "prudential" standing does not implicate a court's subject-matter jurisdiction. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127–128 & n.4 (2014). And it noted that "declin[ing] to adjudicate . . . claim[s] on grounds that are 'prudential,' rather than constitutional . . . is in some tension with our recent reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Id.* at 125–26 (internal quotations omitted) (quoting *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013)). That same term, the High Court acknowledged the overlap between standing and constitutional ripeness and contrasted both with the prudential ripeness requirement. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5, 167 (2014). The Court reemphasized the "tension" between prudential jurisdictional barriers and its duty to hear a proper

case or controversy but chose not to "resolve the continuing vitality of the prudential ripeness doctrine in [that] case." *Id.* Unsurprisingly, the Supreme Court's subsequent caselaw has abandoned any reference to ripeness concerns distinct from the injury-in-fact requirement.

In view of this confusion, it may be time to expunge ripeness from the legal lexicon. Because "Congress, and not the Judiciary, defines the scope of federal jurisdiction," *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 359 (1989), it seems there is no basis to refrain from hearing a jurisdictionally sufficient case until the wine matures to judicial taste. Prudential ripeness does not appear to fit the Supreme Court's contemporary legal formalism. And constitutional ripeness equates to "injury in fact." Keeping ripeness alive, lower courts have tied themselves into jurisprudential knots attempting to rationalize the doctrine.[1]

---

[1] *See Twitter, Inc. v. Paxton*, 26 F.4th 1119, 1123 (9th Cir. 2022) (holding that the fixed standard of constitutional ripeness applies "less stringently" when constitutional rights are asserted but simultaneously reasoning that prudential ripeness is "amplified" when constitutional rights are asserted). And although it is "axiomatic that a court must have jurisdiction before it can [resolve] any" other issues, *Keepseagle v. Vilsack*, 815 F.3d 28, 36 (D.C. Cir. 2016) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998)), numerous circuits have treated prudential ripeness as preceding the jurisdictional inquiry. *See, e.g.*, *BMG Monroe I, LLC v. Village of Monroe*, 93 F.4th 595 (2d Cir. 2024) (acknowledging that "prudential-ripeness doctrine 'is not, strictly speaking, jurisdictional,'" but then concluding that prudential ripeness may be "address[ed] 'in advance of consideration of subject matter jurisdiction'") (internal citation omitted); *Miller v. City of Wickliffe*, 852 F.3d 497, 508 (6th Cir. 2017) (Rogers, J., concurring) (concluding the same); *Paraquad, Inc. v. St. Louis Hous. Auth.*, 259

This case illustrates the confusion that ripeness doctrine can produce. The Commission outlines a series of unknown and "contingent future events" that must occur before Petitioners' grievances are "in fact." It then relies on ripeness rather than standing to support its action. The Commission frames the question as a "prudential matter" calling for an exercise of discretion rather than compliance with a constitutional command. It asks us to balance the hardships rather than to apply Article III's "irreducible constitutional minimum." *Lujan*, 504 U.S. at 560. We rightly conclude that the contingences FERC underscores deprive Petitioners of standing and this Court of jurisdiction. Op. at 9–10. But had we concluded otherwise, none of the Commission's policy concerns or interest balancing should have permitted us to defer resolution.

## II.

I believe a second questionable doctrine presented by this case is worth mention: is it time to mothball associational standing? Supreme Court precedent forecloses such a holding. Nevertheless, there is good reason to believe that associational standing does not meet at least two Article III requisites.

Organizations like Petitioners can satisfy constitutional standing in one of two ways: by suing in their own right or by suing on behalf of their members. *Am. Soc. for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 24 (D.C. Cir. 2011). The first path, which courts term "organizational standing," requires the entity to meet the same standing requirements as "an individual plaintiff." *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011). That makes sense. If an organization *qua* organization is injured, it

---

F.3d 956, 960 (8th Cir. 2001) ("assuming without deciding . . . standing" because the claims were "not ripe").

has a right to the redress thereof just like a natural plaintiff. Its standing has a pedigree going back to the founding. *See, e.g.*, *Trs. of Dartmouth Coll. v. Woodward*, 17 U.S. (4 Wheat.) 518 (1819).

The second path, "associational standing," allows an otherwise uninjured organization to sue if one of its constituent members is aggrieved on the theory that it can assert its members' legal interests. Specifically, the entity must show that "(1) its members would otherwise have standing to sue in their own right; (2) the interests [the organization] seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). So long as a single member can establish Article III standing, the organization can pin *its* standing on that lone member's injury. *See United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 544–55 (1996) (an association has standing if "at least one of [its] members would have standing").

Associational standing departs from the default rule that a plaintiff "cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). As Justice Clarence Thomas recently observed, "[a]ssocational standing seems to run roughshod over th[e] traditional understanding of the judicial power" by "relaxing both the injury and redressability requirements for Article III standing." *FDA v. All. for Hippocratic Med*, 602 U.S. 367, 399 (Thomas, J., concurring). Unsurprisingly, associational standing has no well-rooted historical pedigree. It did not appear until well into the twentieth century and was first used in a case in which the plaintiff-association also had organizational standing to assert its own injury. *See NAACP v.*

*Alabama ex rel. Patterson*, 357 U.S. 449, 458–59 (1958). It was not until 1963 that the Supreme Court recognized associational standing as a standalone basis for jurisdiction and it did so in a one-paragraph per curiam order. *See Nat'l Motor Freight Traffic Ass'n v. United States*, 372 U.S. 246 (1963). Subsequent caselaw indicates that its acceptance was more of an accidental stumble than a well-considered move. *See All. for Hippocratic Med.*, 602 U.S. at 403 (Thomas, J., concurring) (noting that the Court adopted associational standing "without explanation[ and] seemingly by accident"); *Ass'n of Am. Physicians & Surgeons v. FDA.*, 13 F.4th 531, 538 (6th Cir. 2021) ("[the] trail of [associational standing] case citations suggests that this standing arose more from historical accident than practice.").

Consider the problems associational standing poses. We open the courthouse doors to a plaintiff with no intention of vindicating its own legal rights. It need not claim any injury nor seek any redress. *See Warth*, 42 U.S. at 511 ("[E]ven in the absence of injury to itself, an association may have standing solely as the representative of its members"); *Hunt*, 432 U.S. at 342 ("an association may have standing . . . even where it has suffered no injury from the challenged activity."). Instead, we permit organizations to speak for a single one of their constituent members. With a large enough membership, an association could potentially claim universal standing to challenge every statute up and down the U.S. Code. *Cf.* Brief of Professor F. Andrew Hessick as Amicus Curiae Supporting Petitioner at 28–29, *All. For Hippocratic Med.*, 602 U.S. 367 (Nos. 23-235, 23-236) (noting that the American Association of Retired People boasts a membership of over one in ten Americans).

Courts have struggled to accommodate the mismatch between Article III and associational standing. Because a

plaintiff organization relying on associational standing alleges no injury to itself, courts fashion defendant-oriented—as opposed to the traditional plaintiff-oriented—remedies to grant relief to the members whose legal rights the organization is attempting to vindicate. *See* Michael T. Morley & F. Andrew Hessick, *Against Associational Standing*, 91 U. Chi. L. Rev. 1539, 1588–91 (2024) (cataloging this problem); *cf. Lewis v. Casey*, 518 U.S. 343, 357 (1996) (explaining that remedies should be "limited to the inadequacy that produced the injury in fact [to] the *plaintiff*") (emphasis added). The defendant-centric universal injunction has significantly stretched the traditional equitable powers of Article III courts. *See Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch J., with Thomas J., concurring) (describing universal injunctions as "patently unworkable [and] sowing chaos" and questioning "how the court could still be acting in the judicial role of resolving cases and controversies" when providing universal relief); *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 927–28 (2024) (Gorsuch, J., with Thomas & Alito, JJ., concurring) (suggesting that lower courts "retir[e] the universal injunction"). Remedies in associational standing cases extend to members who are not before the court. And those members then avoid the ordinary hurdles of class action certification, which would otherwise serve as a barrier to such expansive relief. Worse still, members of the organization may change throughout litigation, obscuring whose interests are being vindicated and who will eventually be afforded relief. The same problem runs to the preclusive effects of any final judgment.

In my view, this case illustrates problems created by associational standing. A group of uninjured trade and lobbying associations sued on behalf of their various members. Those members may—indeed, likely—themselves suffer no injury in fact. For example, Petitioner Industrial Energy

Consumers of America (IECA) is open to any manufacturer that is a "significant consumer of energy." IECA, *Membership Info*, https://perma.cc/4CQU-2FDQ. IECA claims that its roster includes "over 12,000 facilities nationwide," yet these far-flung members are permitted to sue—through a Washington, D.C.-based nonprofit—regarding development of an Iowa transmission project. IECA, *About IECA*, https://perma.cc/HV82-EHDN. Petitioner Wisconsin Industrial Energy Group is similarly comprised of Wisconsin-based commercial end users of electricity and asserts it has standing because, like IECA and the other Petitioners, at least one member's electricity rates might be affected by the FERC-approved incentive awarded to ITC Midwest.[2]

This Court has considered the inclusion of uninjured class members fatal in the class certification context. *See In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244, 252 (D.C. Cir. 2013) (holding that Rule 23's predominance requirement requires plaintiffs to "show that they can prove, through common evidence, that *all* class members were in fact injured" (emphasis added)). This defect is overlooked if petitioners come to court as an association rather than as a putative class. Neither law nor logic should allow litigants to construct a work-around to avoid the requirements of Federal Rule of Civil Procedure 23. Among those requirements, a class action plaintiff must be truly representative of the "class" it purports to represent. For

---

[2] It is not even clear that Petitioners' assertions satisfy the lax standards for associational standing. It is Petitioners' burden to "make specific allegations establishing that at least one *identified* member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (emphasis added). Petitioners have asserted only that "unidentified members have been injured," which "is not enough" for standing. *Chamber of Com. of U.S. v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011).

associational standing, however, courts require no showing that an association adequately represent its members' interests or that the members have any input into the association's decision making—including its decision to sue.

We, of course, remain bound by Supreme Court precedent permitting this standing deficiency. And rejection of associational standing is not necessary to the disposition of today's case. But the Supreme Court "has never explained or justified [the] doctrine's expansion of Article III standing." *All. for Hippocratic Med.*, 602 U.S. at 398 (Thomas, J., concurring). In my view, a closer look at the doctrine is overdue.